# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TOWN OF SMYRNA, TENNESSEE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:06-cv-0675** |
| | ) | **Judge Trauger** |
| **UNITED STATES ARMY CORPS** | ) | |
| **OF ENGINEERS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is the Motion to Dismiss (Docket No. 32) filed by the defendant, United States Army Corps of Engineers, and the Motion for Partial Summary Judgment (Docket No. 52) and Motion to Exclude Evidence (Docket No. 65) filed by the plaintiff, Town of Smyrna, Tennessee. For the reasons discussed herein, the defendant's Motion to Dismiss will be denied, the plaintiff's Motion for Partial Summary Judgment will be granted, and the plaintiff's Motion to Exclude Evidence will be denied as moot.

## FACTUAL BACKGROUND

Prior to the construction of the J. Percy Priest Reservoir and Dam (the "Reservoir") in the 1960s, the Town of Smyrna (the "Town" or "plaintiff") relied for its water supply on the Stones

1

River, drawing water from two intakes constructed on the river.[1] At that time, the Town drew approximately 6.6 million gallons per day ("mgd") from the river.

In the 1960s, the Army Corps of Engineers (the "Corps" or "defendant") impounded the Stones River to build the Reservoir, which currently is the primary source of water for nearly 50,000 people served by the Town. Prior to beginning construction on the Reservoir, the Corps did not seek, negotiate, or execute an agreement with the Town providing the Town with water supply storage in the Reservoir or requiring the Town's contribution to the cost of constructing the Reservoir. Construction on the Reservoir began in 1963 and was completed in 1967, and the Reservoir was placed into service in 1970. Since the Reservoir was placed into service, the Town has relied for its water supply on water drawn from the Reservoir, primarily through one of its two intakes, and has not entered into a cost-sharing agreement or a water supply storage agreement with the Corps.

According to the Corps, it was unaware that the Town relied on the Reservoir for water supply storage until the Town approached the Corps in 1995 with a proposal to build a new intake and to upgrade its existing primary intake. (*See* Docket No. 58 at 12-13) On February 12, 1997, the Town and the Corps entered an easement with a term of twenty years beginning on December 15, 1996 (the "Easement") that permitted the Town to install a larger pipe on its primary intake, which provides 98% of the Town's water supply. The Easement further provided that the Corps would complete a "reallocation study" with respect to water supply storage in the Reservoir and required the Town to enter a water supply storage agreement with

---

[1]Unless otherwise noted, the facts are drawn from the Complaint (Docket No. 1) as amended (Docket No. 29) and the plaintiff's Response to Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Docket No. 42).

the Corps "upon completion of the reallocation study . . . and the establishment of appropriate rates to be paid by the Town."[2]  The Easement additionally provided that the Town would limit its water usage to 12 mgd prior to the completion of the reallocation study.

In November 2001, the Corps completed its Reallocation Report for Water Supply Storage on J. Percy Priest Reservoir, Tennessee (the "Reallocation Report").  The Reallocation Report provided, in relevant part, that "5,002 acre-feet of storage be reallocated for the Town of Smyrna, and the Town be charged in full for storage necessary to meet its withdrawal needs."[3] The Reallocation Report specified that the Town would be charged a total of $2,912,415, which represented $2,896,158 for "Lump sum cost of Storage" and $16,257 for "Annual O&M Cost." The "Lump sum cost of Storage" amount was derived from the cost of constructing the Reservoir in the 1960s adjusted to present-day dollars, and the "Annual O&M Cost" represented ongoing operation and maintenance costs.

In February 2003, the Corps forwarded a proposed water supply storage agreement to the Town for the Town's signature.  After reviewing the proposed water supply storage agreement and the Reallocation Report, the Town concluded that the calculated charges contained in the

---

[2]In its entirety, the relevant provision of the Easement states:

It is understood by the parties to this easement that the Town of Smyrna, Tennessee will enter into a Water Supply Storage Agreement upon completion of a reallocation study by the Government and the establishment of the appropriate rates to be paid by the Town of Smyrna, Tennessee for water supply storage.  It is further understood and agreed that pending completion of the reallocation study and execution of a Water Supply Storage Agreement, the Town of Smyrna, Tennessee will limit water withdrawal to no more than 12 million gallons per day.

[3]5,002 acre-feet of storage is the equivalent of 18.3 mgd during drought-of-record conditions.  (Docket No. 1 Ex. A)

proposed water supply storage agreement "were not appropriate."  Specifically, the Town

objected to the Corps' calculation on the grounds that the calculation included the cost of

construction, to which the Town had not agreed prior to construction and which already had been

paid, that it improperly adjusted the cost of construction to present-day dollars, that it did not

constitute a "rate" as provided in the Easement, that it did not credit the Town for the amount of

water the Town regularly returns to the Reservoir, that it did not credit the Town for the amount

of water the Town had been able to draw from the Stones River prior to the construction of the

Reservoir, that it utilized the most expensive method of calculating the cost of water supply

storage, and that it did not constitute an appropriate or authorized rate for water supply storage.[4]

In sum, the Town concluded that the Corps acted outside the scope of its statutory authority in

calculating the charges.

Because it objected to the charges calculated by the Corps, the Town refused to enter the

proposed water supply storage agreement.[5]  The parties conducted negotiations with respect to

the proposed water supply storage agreement, but were unable to reach an agreement.

Additionally, the Town reevaluated its water supply needs and requested an increase in its

withdrawal limit of 12 mgd under the Easement.  In a letter dated August 30, 2005, the Corps

denied this request and informed the Town that it "would not be permitted to increase its

---

[4]The Town requested that the Corps provide a legal basis for its calculation.  In response, the Corps indicated that it had relied on the authority provided to it in the Water Supply Act of 1958, the Easement, and internal guidance documents and policies.  The Corps has not provided the Town with the internal guidance documents and policies on which it claims to have relied.

[5]The Town points out that, although it objects to the terms of the proposed water supply storage agreement, it is willing to enter a water supply storage agreement as required under the terms of the Easement, so long as it does not contain charges that the Town believes to be impermissible.

4

withdrawal rate" until the Town entered a water supply storage agreement. The Town currently estimates that it will require 25.5 mgd through the year 2020 to meet its water supply needs.

In a letter dated June 8, 2006 (the "June 8, 2006 Letter"), the Corps provided the Town with written notification that the Town's $3,509,158[6] debt to the United States was delinquent, citing the Water Supply Act of 1958 and the Easement as the basis for the debt and stating that "the Town is out of compliance with the terms of its easement for the water line. This means the easement is subject to termination by the government."[7] The letter provides the Town with information about how to pay the debt, interest rates, and the consequences of delinquency or noncompliance.[8] The Corps included with the letter a proposed water supply storage agreement,

_____

[6]This amount represents the "Lump sum cost of Storage," originally calculated in 2001 dollars in the Reallocation Report, in 2006 dollars.

[7]The Town subsequently confirmed with the Corps that the statement "the easement is subject to termination" means that the Corps may prevent the Town from drawing water through the Town's primary intake, essentially shutting off the Town's main water supply.

[8]In its entirety, the letter states:

This is notification that the Town of Smyrna owes the United States $3,509,158. This debt is delinquent from the date of this demand letter. The basis of this debt is the Water Supply Act of 1958 and the easement granted to the Town of Smyrna.
In 1996, the Town of Smyrna (the Town) was granted an easement for a water line in which the Town agreed to enter into a Water Supply Agreement under the 1958 Water Supply Act as a condition of granting this easement. The water supply agreement was completed and approved by the Assistant Secretary of the Army on November 4, 2002. In February, 2003, the water supply agreement was forwarded to the Town for signature. To date, the Town has refused to sign the agreement and pay the required amount for the storage it is using at the United States J. Percy Priest Dam and Reservoir. Without payment and such an agreement, the Town has no authority to use storage at this facility.

Furthermore, by refusing to execute the water supply agreement, and pay the associated costs, the Town is out of compliance with the terms of its easement for the water line. This means the easement is subject to termination by the

5

government.

A water supply agreement, with costs updated to 2006 levels is enclosed. The cost of the storage for withdrawing 18.3 mgd during a critical period is $3,509,158. If you decide to pay this amount over a 30-year term, the annual payment due is $220,251 based on the FY06 interest rate of 5.125%. In addition, a separate check for the annual Operation and Maintenance (O & M) fee for FY06 in the amount of $16,267 is also due.

Please make your check payable to "Finance & Accounting Officer, USACE, Nashville District," and return it to the above address at the attention of Mr. Kyle Hayworth, H & H Branch. You will also need to sign the attached agreements and return them to Mr. Hayworth.

If payment in full is not received within 30 days from the date of this letter, relevant statutes and regulations authorize interest to be charged on any unpaid portion of the principal from the date of this letter. The interest rate is set each year by the Treasury Secretary, in accordance with 31 U.S.C. 3717, and the rate that is in effect at the time of this notice remains the rate for your debt until it is paid. For your debt, the interest rate would be 2 percent. In addition, a $15 administrative fee may be charged on all delinquent accounts and an additional 6% per annum penalty may be assessed on accounts over 90 days delinquent. This penalty would also be computed retroactively to the date of the bill and may be assessed if payment is not received on or before July 7, 2006.

You may inspect and copy the record pertaining to this debt. However, to avoid interest and other charges, you should act promptly to resolve this matter. Delay will only increase the amount that you owe and will not prevent the Corps from taking steps to recover the monies that you owe. If you fail to make full payment of at least the annual payments referenced above within 30 days, this office will be free to take immediate steps to recoup the debt without further efforts to contact you. This may include referral to the Department of the Treasury for offset of federal funds, or referral to the Department of Justice for the initiation of litigation to enforce the terms of the easement and water supply contract.

I encourage you to make full payment promptly. If you have any questions about this debt, please contact William T. Hill at [(615) ***-****].

The Nashville District has worked with the Town of Smyrna for a decade to reach an agreement on this issue. Our preference remains to enter into a Water Supply Agreement that provides for the legally required payments to the United States, and provides the Town assurance of continue [*sic*] use of the storage. Absent this

6

noting "[o]ur preference remains to enter into a Water Supply Agreement that provides for the legally required payments to the United States, and provides the Town assurance of continue [*sic*] use of the storage."

## PROCEDURAL HISTORY

On July 7, 2006, the plaintiff brought this action seeking a declaratory judgment that the defendant acted outside of the scope of its authority under the Water Supply Act of 1965 ("WSA") in calculating the amount of the debt that the defendant claims the plaintiff owes and in refusing to grant additional water supply storage for the plaintiff because of the dispute. The plaintiff asserted jurisdiction under 28 U.S.C. § 2201 (Declaratory Judgment Act), §1331 (federal question jurisdiction), and §1346 (Little Tucker Act). The plaintiff additionally sought preliminary and permanent injunctive relief to prevent the defendant from shutting off the plaintiff's main water supply, terminating the Easement, or reallocating water designated in the Reallocation Report for the plaintiff's use. The plaintiff subsequently withdrew its motion for a preliminary injunction because the defendant agreed not to undertake, during the litigation of this matter, the action that the plaintiff hoped to enjoin—shutting down any part of the plaintiff's water supply—without first giving the plaintiff sixty days' notice.[9] (Docket No. 9)

_____

> agreement, I have no authority to allow the Town to use the J. Percy Priest Dam and Reservoir for water supply purposes.
>
> I am forwarding a copy of this letter to Michele Elliot and Mark O'Neal with the Town of Smyrna, and also to Jessalyn Hershinger-Zeigler with Bass, Berry & Sims, PLC.

[9]This agreement has been the subject of some ongoing debate between the parties but, for all intents and purposes, remains in effect. (*See* Docket No. 41)

The defendant answered the complaint and asserted a counterclaim seeking a declaratory judgment that the plaintiff is using water supply storage in the Reservoir unlawfully and that the plaintiff must either comply with the terms of the WSA or cease using water supply storage in the Reservoir. (Docket No. 18)

Subsequently, the plaintiff was granted leave to amend its complaint to allege that sovereign immunity has been waived under the Administrative Procedure Act ("APA"). (Docket Nos. 29, 31) The defendant then filed a motion to dismiss asserting that sovereign immunity has not been waived, that the dispute is not ripe for adjudication, and that there is no final agency action subject to review under the APA.[10] (Docket No. 32) That motion has been briefed fully.

Discovery was stayed by court order and the plaintiff was granted permission to file a motion for partial summary judgment. (Docket No. 49) The specific issue before the court on that motion is whether, under the plain language of the WSA, the defendant is authorized to require the plaintiff to pay costs associated with the construction of the Reservoir in the absence of a pre-construction cost-sharing agreement. (Docket No. 52) That motion also has been fully briefed.

In its response to the plaintiff's motion for partial summary judgment, the defendant advanced arguments that go far beyond the limited issue presented to the court in the plaintiff's motion and relies on evidence that would properly be the subject of discovery, had discovery not been stayed. In light of this, the plaintiff additionally has filed a Motion to Exclude Evidence relied on by the defendant in its response. (Docket No. 65)

_____

[10]The defendant has additionally alleged in various other submissions that the plaintiff lacks standing and that it failed to exhaust its administrative remedies. (*See* Docket Nos. 18, 46)

<u>ANALYSIS</u>

The present action presents many thorny questions of administrative law. Before we consider some of those issues in the context of the plaintiff's Motion for Partial Summary Judgment, however, we must address the objections to jurisdiction and to the sufficiency of the plaintiff's claim that have been raised by the defendant.

## I.    Motion to Dismiss

The defendant moved to dismiss the plaintiff's complaint on the grounds that subject matter jurisdiction is lacking, as the defendant has not waived sovereign immunity and as the matter is not ripe for judicial review. In its answer, the defendant additionally asserted that the plaintiff lacks standing to sue and, in its reply on its motion to dismiss, asserted that the plaintiff failed to exhaust its administrative remedies.[11] In addition to these jurisdictional arguments, the defendant contends that the case is not reviewable under the APA as there is no final agency action to review.[12] Each of these issues will be addressed.

_____

[11]Although generally disinclined to address any new grounds for dismissal raised for the first time in a reply, we are cognizant that these additional grounds for dismissal are jurisdictional and require consideration. *See Kontrick v. Ryan*, 540 U.S. 443, 455 (2004); *Airline Prof'ls Ass'n of the Int'l Bhd. of Teamsters, Local Union No. 1224 v. Airborne, Inc.*, 332 F.3d 983, 986 (6th Cir. 2003) ("Article III courts have an independent obligation to determine whether subject matter jurisdiction exists.").

[12]Though the defendant's motion is styled as a motion to dismiss for lack of subject matter jurisdiction, the bulk of the defendant's arguments address whether the action at issue constitutes a "final agency action"—an inquiry that is more aptly characterized as an element of a cause of action under the APA than as a jurisdictional issue. *See Bangura v. Hansen*, 434 F.3d 487, 500 (6th Cir. 2006) ("To state a claim for relief under the APA, a plaintiff must allege that his or her injury stems from a final agency action for which there is no other adequate remedy in court."); *see generally Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006) (describing criteria for determining whether a statutory requirement is jurisdictional). As such, this court will treat the defendant's arguments with respect to whether there has been a final agency action as if they were raised on a motion to dismiss for a failure to state a claim under Federal Rule of Civil

9

A.      *Jurisdictional Issues*

1.      12(b)(1) Standard

The defendant has brought this motion pursuant to Federal Rule of Civil Procedure 12(b)(1).  When a defendant challenges subject matter jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of proving jurisdiction.  *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005).  Additionally, the plaintiff bears the burden of proving each element of Article III standing.  *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997) ("[E]ach element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation.'") (citation omitted).  The district court is empowered to resolve factual disputes when necessary to resolve challenges to subject matter jurisdiction.  *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994), *cert. denied*, 513 U.S. 868 (1994).

As a preliminary matter, the defendant claims that none of the statutes on which the plaintiff bases jurisdiction is sufficient to confer subject matter jurisdiction.  (Docket No. 33 at 4-5.)  As the claims alleged by the plaintiff arise under the Water Supply Act, federal question jurisdiction exists.  28 U.S.C. § 1331 (2000); *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993) (noting that the federal question jurisdiction statute provides the federal district courts with jurisdiction to review agency action).

We now consider whether the exercise of jurisdiction is prohibited by the doctrines of sovereign immunity, ripeness, or standing, or by the requirement that the plaintiff exhaust its administrative remedies.

─────────────

Procedure 12(b)(6).

10

2. Sovereign Immunity

In relevant part, the APA provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (2000). This provision does not independently confer subject matter jurisdiction, *Califano v. Sanders*, 430 U.S. 99, 105 (1977) ("[T]he APA is not to be interpreted as an implied grant of subject matter jurisdiction to review agency actions."); *Dixie Fuel Co. v. Comm'r of Soc. Sec.*, 171 F.3d 1052, 1057 (6th Cir. 1999), but it does have a bearing on the proper exercise of jurisdiction, in that it functions to waive sovereign immunity and provide for judicial review of an agency action where a plaintiff seeks non-monetary relief in a suit against the United States. *See Capitol Park Ltd. Dividend Hous. Ass'n v. Jackson*, 202 Fed. Appx. 873, 877 (6th Cir. 2006) ("The [APA] waives sovereign immunity for claims for equitable relief against federal officials."); *United States v. City of Detroit*, 329 F.3d 515, 520-21 (6th Cir. 2003) (holding that court had jurisdiction over suit against Army Corps of Engineers because, under Section 702, "[t]he government has waived its immunity with respect to non-monetary claims"). The Supreme Court has stated that the judicial review provisions embodied in Section 702 should be given "generous" and "hospitable" interpretations, *Abbott Labs. v. Gardner*, 387 U.S. 136, 140-41 (1967), *overruled on other grounds*, *Califano*, 430 U.S. at 105, and that the purpose of the provision is to "broaden the avenues for judicial review of agency action by eliminating

11

the defense of sovereign immunity in cases covered by the amendment," *Bowen v. Massachusetts*, 487 U.S. 879, 891-82 (1988).

As the plaintiff here does not seek monetary relief, the waiver of sovereign immunity evinced in Section 702 applies.

3. Ripeness

The exercise of jurisdiction is only proper if a case is ripe for review. *Dixie Fuel*, 171 F.3d at 1057 ("[T]he exercise of jurisdiction requires that the case be ripe for review."). Determining whether a case is ripe for review requires consideration of "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149.

The Supreme Court in *Abbott Laboratories* elucidated a number of factors that are relevant in evaluating whether an issue is fit for judicial decision, including whether the issue presented is a legal question, whether the action involved is a final agency action, and whether the action has a direct and immediate impact on the party challenging the action. *See id.* at 149-53. Courts also consider whether resolving the dispute would interfere with "effective enforcement and administration by the agency," *Prod. Credit Ass'n of N. Ohio v. Farm Credit Admin.*, 846 F.2d 373, 374-75 (6th Cir. 1988), and whether further factual development of the issues would aid the court in resolving the dispute, *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

First, the question presented here is purely legal, in that the dispute centers on the scope of the defendant's authority under the WSA and whether the defendant acted within its authority

in requiring that the plaintiff pay costs associated with the construction of the Reservoir in the absence of a pre-construction cost-sharing agreement.

With respect to the second factor, the challenged agency action is the defendant's determination that the plaintiff owes the United States for costs associated with the construction of the Reservoir.  This determination is embodied in the defendant's June 8, 2006 Letter in which the defendant demanded immediate payment of the debt and spelled out the consequences of noncompliance.  For the reasons discussed *infra* Section I.B.2, this action is a final agency action within the meaning of the APA.

Third, the effect on the plaintiff of the defendant's determination, as described in the June 8, 2006 Letter, was direct and immediate.  By its own terms, the letter constituted a "demand," required the plaintiff's immediate compliance, and stated that "[d]elay will only increase the amount that you owe and will not prevent the Corps from taking steps to recover the monies that you owe."  (Docket No. 1 Ex. B)  The letter further made clear that the cost of noncompliance with the defendant's determination would be severe and that the penalties could include the termination of the Easement—essentially, a threat to shut off the plaintiff's main water supply. (*Id.*)  The plaintiff was faced with what it characterizes as a "Hobson's choice."  On the one hand, the plaintiff could accept the terms of the water supply agreement proposed by the defendant and pay costs associated with construction of the Reservoir, which the plaintiff believed to be illegal and which would result in a great financial burden to the plaintiff.  On the other hand, the plaintiff could refuse to accede to the defendant's demand and risk having the defendant shut off the plaintiff's main water supply, which would surely impose not only a financial burden on the plaintiff but also a human cost on the individuals and businesses that rely

on the Reservoir daily. This choice truly is no choice at all, and the plaintiff responded by seeking judicial review to challenge the defendant's determination and prevent the defendant from shutting of the plaintiff's main water supply.

Additionally, we must consider whether the exercise of jurisdiction over this dispute will hamper the defendant's ability to enforce and administer the law effectively. The defendant claims that to grant judicial review would be to "inject the court into administrative negotiations before they are completed." (Docket No. 46) The June 8, 2006 Letter, however, was couched in conclusory terms and provided no indication that it merely reflected the defendant's "negotiating position." The letter also did not suggest that there was further internal analysis to be completed by the agency, that the decision was subject to change, or that a judicial determination would interfere with other matters pending before the agency. *Ammex, Inc. v. Cox*, 351 F.3d 697, 708 (6th Cir. 2003) (citing *Abbott Labs.*, 387 U.S. at 151, and noting that a matter is ripe if the agency decision is "unlikely to change" and there is "'no hint' that the regulation was tentative") (citation omitted).

With respect to the fifth factor, there is no evidence that delaying resolution of this matter will enable further development of the factual issues involved, or that such development would assist the court in reaching a determination of the very narrow issue before the court. The parties have been engaged in a dispute over the proposed terms of the water supply storage agreement for years. Those negotiations have never been resolved and there is no evidence that there is any room for further meaningful negotiation; thus further factual development is unlikely.

Finally, in considering the hardship to the parties of foregoing a judicial resolution to this matter, we consider whether the plaintiff would otherwise be subject to "adverse effects of a

14

strictly legal kind," *Ohio Forestry Ass'n*, 523 U.S. at 733, and whether the agency action

significantly affects the plaintiff's "primary conduct," *Nat'l Park Hospitality Ass'n v. Dep't of*

*the Interior*, 538 U.S. 803, 810 (2003); *see also Abbott Labs.*, 387 U.S. at 153 (stating that,

where an agency action "requires an immediate and significant change in the plaintiff's conduct

of their affairs with serious penalties attached to noncompliance, access to the courts under the

Administrative Procedure Act and the Declaratory Judgment Act must be permitted").

Additionally, we consider "the likelihood that the harm alleged by plaintiffs will ever come to

pass." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997) (citing *United*

*Steelworkers of Am., Local 2216 v. Cyclops Corp.*, 860 F.2d 189, 194 (6th Cir. 1988)).

The June 8, 2006 Letter made clear the defendant's position that the plaintiff is legally

obligated to pay a debt based on the costs associated with the construction of the Reservoir. The

letter also made clear that the plaintiff would be subject to legal action, and its main water supply

would be in peril, if it failed to comply with the terms of the letter. As the guardian of the water

supply for its constituents, the plaintiff had no choice but to treat the defendant's threats as real

and respond accordingly.[13] Although the defendant claims that the plaintiff "has other choices"

in this matter, the choice to the plaintiff of paying the debt, which it believes to be illegal, or

---

[13]The defendant's actions during the course of this litigation indicate that the defendant
considers the possibility of shutting of the plaintiff's main water supply a viable means of
resolving the dispute, and it has wielded that possibility as a hammer over the plaintiff's head.
For example, after agreeing with the plaintiff that it would not shut of the main water supply
without providing sixty days' notice, (Docket No. 9 Ex. A), the defendant promptly sent the
plaintiff a letter indicating that it was "reserving its right" to shut off the main water supply after
sixty days, (Docket No. 34 Ex. A). The purpose of the agreement was to enable the parties to
litigate this matter without the plaintiff fearing that its water supply might be compromised
without warning, and the meaningless "maybe-we-will-and-maybe-we-won't" notice that the
defendant provided undermined that agreement.

putting its main water supply at risk is no real choice at all and is precisely the kind of dilemma that contributes to a finding of ripeness under *Abbott Laboratories*. *See* 387 U.S. at 153; *Nat'l Rifle Ass'n*, 132 F.3d at 286-87. As such, the hardship faced by the plaintiff in the absence of judicial review is both imminent and severe.

This matter is ripe for judicial review in light of the hardship to the plaintiff of foregoing a resolution, and as the other relevant factors render the matter fit for judicial review.

4.    Standing

In a case brought under the APA, standing has two components: a constitutional component and a prudential component. *Dismas Charities, Inc. v. U.S. Dep't of Justice, Fed. Bur. of Prisons*, 401 F.3d 666, 671 (6th Cir. 2005). To satisfy the constitutional component of the standing inquiry, the plaintiff must demonstrate that it suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury is likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Under the first prong of the standard, the injury must be "concrete and particularized" and must be "actual or imminent" rather than "conjectural or hypothetical." *Bennett*, 520 U.S. at 167. As this issue is before the court on a motion to dismiss, the bar for establishing the elements of standing is relatively modest. *See id.* at 167-68.

The plaintiff contends that it faces imminent harm—namely, that it must either pay a substantial debt that it believes to be illegal or risk having its main water supply shut off. The defendant counters that the plaintiff has not suffered injury, as the defendant has "neither taken nor threatened to take any action that will cause the plaintiff legal harm." (Docket No. 46) According to the June 8, 2006 Letter, the defendant determined that the plaintiff owes the United

16

States for costs associated with the construction of the Reservoir, that that debt is overdue, and that the plaintiff must act immediately or face consequences for noncompliance. Although the defendant has not yet taken action to shut off the plaintiff's water supply, it has threatened to do so as a consequence for the plaintiff's noncompliance and has indicated through its actions that those threats are real. *See supra* Section I.A.3. Additionally, as the plaintiff seeks declaratory and injunctive relief that would prevent the defendant from forcing the plaintiff to enter the proposed water supply agreement or from shutting off the plaintiff's main water supply, the harm alleged may be redressed by a favorable decision in this action. Thus, the plaintiff has established constitutional standing.

To satisfy the prudential component of the standing inquiry, the plaintiff must demonstrate that it is "*arguably* within the zone of interests" intended to be protected or regulated by the statute. *Bangura*, 434 F.3d at 499 (citing *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 487-90 (1998)). The key question in this inquiry is "not whether the overall statute in question furthers goals shared by the plaintiff, but whether the particular statutory (or regulatory or constitutional) provision relied upon by the plaintiff to win in court protects the interests of someone in the plaintiff's position." *Dismas Charities*, 401 F.3d at 673-74 (citing *Bennett*, 520 U.S. at 175-76).

The stated purpose of the WSA is to "recognize the primary responsibilities of the States and local interests in developing water supplies . . . and that the Federal Government should participate and cooperate with States and local interests in developing such water supplies . . . ." 43 U.S.C. § 390b(a) (2000). The specific WSA provision on which the plaintiff relies states that "before construction or modification of any project including water supply provisions for present

demand is initiated, State and local interests shall agree to pay for the cost of such provisions in accordance with the provisions of this section." 43 U.S.C. § 390b(b) (2000). Both the WSA as a whole and the specific provision on which the plaintiff relies regulate the responsibilities of the federal government vis-a-vis those of state and local interests in the process of developing water supplies. Thus, the plaintiff, a local interest under the WSA, most certainly falls within the zone of interests regulated or protected by the provision of the statute on which it relies.

As the plaintiff has alleged facts to establish both constitutional and prudential standing, jurisdiction is appropriate.

### 5. Exhaustion of Administrative Remedies

The defendant asserts that the plaintiff failed to exhaust its administrative remedies in that it did not appeal the defendant's decision to the Assistant Secretary of the Army for Civil Works. (Docket No. 46 at 6) Under the APA, however, a plaintiff is required to exhaust only those administrative remedies that are made mandatory by a statute or agency rule. 5 U.S.C. § 704 (2000) ("Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority."); *Darby v. Cisneros*, 509 U.S. 137, 146 (1993) ("[The APA], by its very terms, has limited the availability of the doctrine of exhaustion of administrative remedies to that which the statute or rule clearly mandates."). Where an appeal is optional, the APA does not require a plaintiff to exhaust that remedy before seeking judicial review of the agency's decision. *Bangura*, 434 F.3d at 498. Moreover, the Sixth Circuit has gone further and stated that

18

not only is an APA plaintiff not *required* to exhaust administrative remedies not required by statute, but also that courts *do not have the discretion to require* such exhaustion. *Dixie Fuel*, 171 F.3d at 1059.

In this case, the WSA does not provide for an administrative review or appeal process or otherwise require the plaintiff to exhaust its administrative remedies before seeking judicial review. Thus the plaintiff was not required to do so before seeking judicial review under the APA, and there is no bar to the exercise of jurisdiction in this case.

B.    *Sufficiency of the Plaintiff's Claim*

1.    12(b)(6) Standard

In deciding a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court will accept as true the facts as the plaintiff has pleaded them. *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002); *Performance Contracting, Inc. v. Seaboard Sur. Co.*, 163 F.3d 366, 369 (6th Cir. 1998). The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "Indeed it may appear on the face of the pleadings that recovery is very remote and unlikely but that is not the test." *Scheuer*, 416 U.S. at 236. Rather, challenges to the merits of a plaintiff's claim should be "dealt with through summary judgment under Rule 56." *Swierkiewicz*, 534 U.S. at 514.

19

In *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955, 1964-65 (2007), the Supreme Court readdressed the pleading requirements under the federal rules. The Court stressed that, although a complaint need not plead "detailed factual allegations," those allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 1964-65. "The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, No. 03-5306, 2007 U.S. App. LEXIS 20556, at *6 (6th Cir. Aug. 28, 2007) (citing *Twombly*, 127 S.Ct. at 1965). Further, the Court observed that Federal Rule of Civil Procedure 8(a)(2) does require a "showing" that the plaintiff is entitled to relief and that this substantive threshold is not achieved by conclusory assertions. *Twombly*, 127 S.Ct. at 1965 n.3.

Although Federal Rule of Civil Procedure 8 establishes a "liberal system of notice pleading," *see Equal Employment Opportunity Comm'n v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). Accordingly, to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965; *see also Swierkiewicz,* 534 U.S. at 508 n.1; *Neitzke v. Williams,* 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer,* 416 U.S. at 236 (a well-pleaded complaint may proceed, even if it

20

appears "that a recovery is very remote and unlikely").  With this standard in mind, the court

turns to an analysis of the plaintiff's claims.

2.    Analysis

Under the APA, an agency action is only reviewable if it is made so by statute or if it

represents "final agency action for which there is no other adequate remedy in a court."  5 U.S.C.

§ 704 (2000).  As there is no statute that renders the defendant's determination in this case

reviewable, we must determine whether there has been a final agency action under the terms of

Section 704.

An action constitutes a final agency action if it (1) "marks the consummation of the

agency's decisionmaking process" and (2) is "one by which rights and obligations have been

determined or from which legal consequences will flow."  *Bennett*, 520 U.S. at 177-78

(quotations and citations omitted).  The "core question is whether the agency has completed its

decisionmaking process, and whether the result of that process is one that will directly affect the

parties."  *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir. 1997) (citing *Franklin v.*

*Massachusetts*, 505 U.S. 788, 797 (1992)).  Additionally, the second prong of the *Bennett* test is

satisfied if the action "has direct and appreciable legal consequence," and it is not satisfied if the

action is "purely advisory and in no way affected the legal rights of the relevant actors."  520

U.S. at 178.  The identity of the decisionmaker is also relevant to the analysis; if the regulation is

informal, tentative, or represents the ruling of a "subordinate official," the agency action is not

considered final.  *See Abbott*, 387 U.S. at 151.

The parties here vigorously dispute whether the defendant's determination that the

plaintiff owes the United States for costs associated with the construction of the Reservoir

21

constitutes a final agency action. The plaintiff claims that the language of the June 8, 2006 Letter made clear the finality of the defendant's determination, while the defendant asserts that the letter was merely a reflection of its negotiating position and that the plaintiff's obligations had not been "finally determined" as of the date of the letter. As the letter articulates the defendant's determination, a close look at its terms is instructive.

The letter opens by stating, "[t]his is notification that [the plaintiff] owes the United States $3,509,159. . . . [B]y refusing to execute the water supply agreement, and pay the associated costs, the [plaintiff] is out of compliance with the terms of its easement for the water line. This means the easement is subject to termination by the government." (Docket No. 1 Ex. B) The letter describes the consequences of failing to pay the debt: "If payment in full is not received within 30 days from the date of this letter, relevant statutes and regulations authorize interest to be charged on any unpaid portion of the principal . . . . However, to avoid interest and other charges, you should act promptly to resolve this matter. *Delay will only increase the amount that you owe and will not prevent the Corps from taking steps to recover the monies that you owe.* If you fail to make full payment of at least the annual payments referenced above within 30 days, *this office will be free to take immediate steps to recoup the debt without further efforts to contact you.*" (*Id.*) (emphasis added). Finally, the letter states that, "[a]bsent [a water supply storage agreement], I have no authority to allow the Town to use the J. Percy Priest Dam and Reservoir for water supply purposes." (*Id.*)

With respect to the first prong of the *Bennett* analysis, the June 8, 2006 Letter made quite clear that the defendant's determination represented the consummation of its decisionmaking. The letter's terms were definite and unequivocal, stating that "[d]elay will only increase the

amount" of the debt and will not alter the defendant's determination. The letter was not

hypothetical and did not represent speculation or opinion; it never suggested that the defendant's

method of calculating the debt was open to negotiation or that the letter represented anything

other than the defendant's final determination of the amount of the debt and the consequences for

noncompliance with its terms.

Despite the defendant's claims to the contrary, the letter provided no indication that it is

an interim step in an on-going negotiation.[14] It did not invite the plaintiff to make a counter-

offer, inform the plaintiff of any appeal procedure or internal process for reviewing the decision,

or couch its terms in advisory or tentative language. Additionally, the letter clearly did not

contemplate any further communications on the subject, stating that the defendant considered

itself "free to take immediate steps to recoup the debt *without further efforts to contact you*."

To the extent that there ever was any real negotiation, the letter was by all accounts a statement

of the defendant's last best offer, and evidenced the defendant's unwillingness to negotiate any

further.

Moreover, the defendant's claim that there has been no final agency action because it has

not yet sought to shut off the plaintiff's main water supply is self-serving and completely ignores

relevant events. The June 8, 2006 Letter makes clear that the defendant considers terminating

the Easement and thus shutting off the plaintiff's main water supply as a means of resolving the

dispute. Plaintiff need not wait until tens of thousands of people are without water to establish

that there has been a final agency action; an agency action may be considered final even if it has

---

[14]The defendant's tautological argument that its "negotiations" with the plaintiff have not
concluded because no agreement between the parties yet exists is without merit. As any student
of negotiation knows, the end point of a negotiation is not necessarily an agreement.

not yet "reached its complete development." *Abbott Labs.*, 387 U.S. at 150 (citing *Frozen Food Express v. United States*, 351 U.S. 40 (1956)).

The defendant further claims that the action is not final because the author of the June 8, 2006 Letter did not have the power to negotiate the terms of the proposed water supply agreement or to sign any such agreement. The letter itself, however, is not the agency action at issue here. Rather, the defendant's determination of the debt owed by the plaintiff is the relevant action, and the letter simply represents the communication of that determination. There is no indication that the determination was made by a subordinate officer, but merely that the individual chosen to communicate that decision—the letter's author—was a subordinate official. The determination as described in the letter has none of the hallmarks of a ruling by a subordinate official; it is not tentative and does not indicate that the author was making an interim, advisory, conditional, or preliminary ruling, that any further review was available, or that any higher authorization was necessary to enforce the terms stated in the letter. *Id.* at 151 (finding that final agency action existed where there was "no hint that this regulation is informal, or only the ruling of a subordinate official, or tentative"). Indeed, by placing the enforcement of its determination in the hands of someone without the power to modify the determination, the defendant tacitly acknowledged that its determination was final and not subject to change.

With regard to the second prong of the analysis, the defendant's determination has enormous legal ramifications for the plaintiff, who, according to the defendant, is in default on a debt and is subject to legal action to recover that debt. Although it ostensibly provides the plaintiff with a choice to comply with its terms, the sanctions that the letter spells out for noncompliance are severe. The fact that the plaintiff is presented with a so-called choice

24

between compliance and the risk of serious sanctions does not prevent a finding that the decision constitutes a final agency action. *See id.*, 387 U.S. at 152-53 (finding that final agency action existed where plaintiff had choice of compliance, which would require significant financial investment, or noncompliance, which "would risk serious criminal or civil penalties").

As the plaintiff has demonstrated that there has been final agency action in this case,[15] the defendant's determination as described in the June 8, 2006 Letter is reviewable under the APA.

## II.     Motion for Partial Summary Judgment

The plaintiff has moved for partial summary judgment on the issue of the scope of the defendant's authority under the WSA. Specifically, the plaintiff contends that the plain language of the WSA did not authorize the defendant to require that the plaintiff pay costs associated with the construction of the Reservoir, in the absence of a pre-construction cost-sharing agreement. (Docket No. 52 at 1)

### A.     *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

---

[15]In addition to the final agency action requirement, there also must be no other alternative remedy in a court for a decision to be reviewable under the APA. *See* 5 U.S.C. § 704 (2000); *Bangura*, 434 F.3d at 501. The WSA is silent as to judicial review, and the parties have not pointed the court to any other statutory scheme of review that would preclude review here.

In determining whether the moving party has met its burden, the court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

B.      *The Water Supply Act*

26

There is no factual dispute here. The defendant does not contest that, prior to beginning construction on the Reservoir, it did not seek, negotiate, or execute an agreement with the plaintiff to provide the plaintiff with water supply storage in the Reservoir once the Reservoir was completed or to require the plaintiff's contribution to the cost of construction. (Docket No. 62 ¶ 4) Further, although the parties quibble over language, the defendant does not meaningfully contest that its determination of the debt that it claims the plaintiff owes the federal government, as expressed in its June 8, 2006 Letter, is derived from the cost of constructing the Reservoir in the 1960s, adjusted to present-day dollars. (Docket No. 62 ¶ 1) Thus, the sole issue is whether these undisputed facts require the conclusion that the defendant acted outside the scope of its authority under the plain language of the WSA.

The WSA was enacted in 1958 "to recognize the primary responsibilities of the States and local interests in developing water supplies . . . and that the Federal Government should participate and cooperate with the States and local interests in developing such water supplies in connection with the construction, maintenance, and operation of Federal navigation, flood control, irrigation, or multiple purpose projects." 43 U.S.C. § 390b(a) (2000) (Declaration of Policy). Thus, the stated purpose of the statute is to regulate the relationships among federal, state, and local interests in developing water supplies. As the statute is relatively brief, and as the parties rely on a number of its provisions in their arguments, a thorough review of the relevant operational provisions is appropriate.

The statute provides that the defendant may take into account the value of water supply storage in determining the value of a planned reservoir project. 43 U.S.C. § 390b(b) (2000) ("[S]torage may be included in any reservoir project surveyed, planned, or constructed or to be

27

planned, surveyed and/or constructed by the Corps of Engineers or the Bureau of Reclamation to impound water for present or anticipated future demand or need for municipal or industrial water, and the reasonable value thereof may be taken into account in estimating the economic value of the project."). The statute further provides that the cost of constructing or modifying a water supply project "shall be determined on the basis that all authorized purposes served by the project shall share equitably in the benefits of multiple purpose construction, as determined by the Secretary of the Army . . . ." *Id.*

The next provision of the WSA is at the core of the parties' dispute, and requires that a local interest agree to pay for the cost of a water supply project before the project begins. *Id.* ("[B]efore construction or modification of any project including water supply provisions for present demand is initiated, State or local interests shall agree to pay for the cost of such provisions in accordance with the provisions of this section."). The defendant may permit local interests to pay for the cost of a water supply project either "without interest, during construction of the project, or, with interest, over a period of not more than thirty years from the date of completion." *Id.*

With respect to ongoing operation and maintenance costs, the WSA provides that "all annual operation, maintenance, and replacement costs for municipal and industrial water supply storage under the provisions of this section shall be reimbursed from State or local interests on an annual basis."[16] *Id.* Finally, the WSA provides that the defendant must obtain Congressional approval before modifying a previously constructed water supply project to include water supply

---

[16]The plaintiff does not contest that the defendant is authorized under the WSA to seek annual operation and maintenance costs. (Docket No. 1 at 9) Thus, the only charges at issue here are those that are derived from the cost of constructing the Reservoir.

28

storage where the modification "would seriously affect the purposes for which the project was authorized, surveyed, planned, or constructed, or . . . would involve major structural or operational changes."  43 U.S.C. § 390b(d) (2000).

C.      Statutory Analysis

The first step in interpreting a statute is to consider whether the language of the statute has a "plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)); *see also Chrysler Corp. v. Commissioner*, 436 F.3d 644, 654 (6th Cir. 2006) (citations omitted).  If the language is unambiguous, the inquiry ceases, and it is improper to consider legislative history or other external factors.  *Barnhart*, 534 U.S. at 450; *Cowherd v. Million*, 380 F.3d 909, 913 (6th Cir. 2004) ("When a statute is unambiguous, resort to legislative history and policy considerations is improper.").  In considering the language of the statute, we look both to the specific statutory language at issue as well as the "statute's design as a whole." *Riley v. Kurtz*, 361 F.3d 906, 913 (6th Cir. 2004).  The statute must be interpreted so as to give meaning and effect to each word, and interpretations "which would render words superfluous or redundant" must be avoided.  *Id.* (citing *Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001)). Additionally, the statute must be interpreted so as not to result in a reading that is inconsistent with the intent of Congress or in an absurdity.  *See id.* ("We may not rely on the literal language of the statute if 'absurd results or an interpretation inconsistent with the intent of Congress' would be the outcome.").

The issue in dispute on the plaintiff's motion for partial summary judgment is whether, under the plain language of the WSA, the defendant acted outside the scope of its authority by

29

requiring the plaintiff to pay costs associated with the construction of the Reservoir, in the absence of a pre-construction cost-sharing agreement. The relevant statutory language provides "*before construction or modification* of any project including water supply provisions for present demand is initiated, State or local interests *shall* agree to pay for the cost of such provisions in accordance with the provisions of this section." 43 U.S.C. § 390b(b) (2000) (emphasis added). Thus, the WSA contains two triggers—the construction of a new project or the modification of an existing one—and requires a local interest, such as the plaintiff, to enter an agreement to pay for the cost of the project prior to its construction or modification.

Perhaps unsurprisingly, the parties' respective arguments are predicated on two entirely different understandings of the facts of this case. Essentially, the defendant claims that it was unaware of the plaintiff's use of water supply storage in the Reservoir until 1995, when the plaintiff sought to add a new intake and upgrade its existing primary intake. At that point, the defendant entered the Easement to permit the plaintiff to rely on the Reservoir for water supply storage while the defendant conducted a reallocation study and subsequently published the Reallocation Report. The plaintiff, by contrast, implies that the defendant knew or should have known about the plaintiff's use of water supply storage in the Reservoir or, at the very least, that the plaintiff did not have an affirmative responsibility to make its usage known to the defendant and to enter an agreement with the defendant to bear the cost of construction.

In the plaintiff's view, the event that triggered the WSA's agreement requirement here was the construction of the Reservoir. According to the plaintiff, the WSA requires a cost-sharing agreement prior to construction if a local interest ever is to contribute to the cost of construction. As there was no pre-construction agreement in this case, the plaintiff contends that

30

the defendant had no authority to seek construction costs subsequent to construction and that any other interpretation would render the term "before construction" in the WSA meaningless. Additionally, the plaintiff argues that any other interpretation would render meaningless a subsequent provision of the WSA requiring a local interest to repay construction costs "without interest, during construction of the project, or, with interest, *over a period of not more than thirty years* from the date of completion." 43 U.S.C. § 390b(b) (2000) (emphasis added). By its very terms the statute requires repayment within *at most* thirty years of construction. Construction of the Reservoir was completed nearly forty years ago, and the plaintiff thus contends that an interpretation permitting the defendant now to assess charges relating to the cost of construction would render the WSA's thirty-year repayment limitation meaningless.

In the defendant's view, the event that triggered the WSA's agreement requirement here was not the construction of the Reservoir, as the plaintiff contends, but rather the modification of the Reservoir that resulted from the plaintiff's 1995 request for a reallocation of water supply storage in the Reservoir. According to the defendant, a reallocation of water supply storage, though not requiring any physical alteration to a water supply project, still constitutes a "modification" under the terms of the WSA and requires the existence of a cost-sharing agreement as a "prerequisite" to granting a request for water supply storage. The statute itself does not define the term "modification," but its ultimate provision sheds some light on the term. That provision mandates that Congressional approval is required for any modification that "would involve major structural or operational changes" to a reservoir project. 43 U.S.C. § 390b(d) (2000). Thus, the defendant argues, "modification" is an umbrella term that includes, but is not limited to, major structural and operational changes.

31

To the extent that the WSA's agreement requirement was triggered by the construction of the Reservoir some forty years ago, the court agrees with the plaintiff that the defendant cannot now charge the plaintiff for construction costs in the absence of a pre-construction cost-sharing agreement. In *Dixie Fuel Co. v. Commissioner of Social Security*, the Sixth Circuit addressed a similar question of statutory interpretation and reached the same result. 171 F.3d 1052 (6th Cir. 1999). The statute at issue in *Dixie Fuel* authorized the Social Security Administration to "assign" eligible coal industry retirees and their dependents to coal operators "before October 1, 1993," and the operators were then required to pay premiums for those assigned beneficiaries. *Id.* at 1054. The plaintiff, a coal operator, challenged the Social Security Administration's attempt to assign coal beneficiaries after October 1, 1993, arguing that those assignments were void under the statute. *Id.* at 1056. The Court ruled for the plaintiff, finding that, "[b]ecause the statute requires that the [agency] make all assignments of beneficiaries before October 1, 1993, it does not permit the [agency] to make such assignments after that date." *Id.* at 1064.

Like the statute at issue in *Dixie Fuel*, the WSA clearly authorizes—indeed requires—agency action prior to a specified time. Here, the WSA requires the existence of a cost-sharing agreement *before construction or modification* of a water supply project. Although the language in the WSA is mandatory with respect to the actions of local interests, as opposed to the actions of the agency, as was the case in *Dixie Fuel*, it also requires the federal government's cooperation and contemplates that the defendant will seek the agreement of local

32

interests prior to construction.[17]  As the defendant undertook construction in the absence of such an agreement, it is not now authorized to require the plaintiff to shoulder those costs.

The defendant is correct, however, that the WSA's agreement requirement can be triggered by a modification of a water supply project and that a modification may consist of not only a physical alteration but also an operational change, such as the reallocation of water supply storage.  Thus, the reallocation of water supply storage provided for by the Reallocation Report constitutes a modification and triggered the WSA's agreement requirement.  Regardless of this, the defendant's argument still fails.  The WSA states that, "before construction or modification . . . state or local interest shall agree to pay for the cost of *such provisions*."  43 U.S.C. § 390b(b) (2000) (emphasis added).  The cost of "such provisions" here is the cost of the modification—that is, the cost of reallocating the existing water supply storage.  Thus, the plaintiff is required to pay only for costs associated with that modification, and not for costs associated with the initial construction of the project decades ago.

There can be no doubt that the Reservoir is federal government property and that, in the absence of the Easement or a water supply storage agreement between the parties, the plaintiff has no inherent right to use water supply storage in the Reservoir.  The plaintiff, however, does not object to entering a water supply storage agreement, but simply objects to a water supply

_____

[17]The fact that the WSA states that a local interest "shall agree" is telling.  Although mandatory as to the actions of the local interest, as opposed to those of the defendant, the use of the term "agree" presupposes another actor involved in the process.  If the mandatory language does not also extend to the defendant, then with whom would a local interest agree?  Moreover, we note that, although the WSA is mandatory in that the local interest must agree to a cost-sharing agreement prior to construction, the defendant's practice in this case of taking a position and refusing to move from that position is not in keeping with the WSA's admonition that the defendant "participate and cooperate" with local interests.

storage agreement that includes charges derived from the cost of constructing the Reservoir. As the WSA does not provide the defendant with the authority to seek such costs in the absence of a pre-construction cost-sharing agreement, the parties should be able to reach an agreeable solution to what essentially is a contract dispute.

The court is cognizant of the fact that the defendant believes that the plain meaning of the statute is inconsistent with Congress's intent in enacting the WSA. Congress stated that the purpose of the WSA was "to recognize the primary responsibilities of the States and local interests in developing water supplies for domestic, municipal, industrial, and other purposes and that the Federal Government should participate and cooperate with States and local interests in developing such water supplies . . . ." 43 U.S.C. § 390b(a) (2000). Although one purpose of the WSA clearly was to induce local interests to take "primary" responsibility for their water supplies and the costs thereof, the court cannot conclude that the statute was intended to require the plaintiff, which did not seek the construction of the Reservoir and was not approached by the defendant regarding the construction of the Reservoir, to seek affirmatively to pay for the cost of constructing a project undertaken by the defendant. Moreover, such a result does not create an absurdity. *See Barnhart*, 534 U.S. at 459 (noting that courts "rarely invoke an absurdity test" to override unambiguous statutory language). It is not absurd to conclude that Congress intended to require the Corps to seek, and local interests to agree to, cost-sharing prior to the construction or modification of a water supply project. Such a reading is entirely consistent with Congress's intent, as it induces the parties involved—both local interests and the Corps—to establish the financial framework of a project before construction begins. The WSA requires the federal government's participation and cooperation in this process; the defendant thus bears some

responsibility for obtaining the *timely* agreement of affected local interests before it moves forward with a project such as the construction of the Reservoir, if it is to obtain contributions from local interests for that construction.

As the defendant complains, this holding may be inconsistent with the defendant's long-standing interpretation of the WSA. The defendant's interpretation, however, does not prevail when it is in conflict with the plain language of the statute. *Dixie Fuel*, 171 F.3d at 1061 (citing *Chevron v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984), and stating that the question of whether the language of the statute plainly evidences congressional intent is "a prerequisite to deciding whether an agency's interpretation should be accorded deference"). Absent ambiguity in the underlying statute, courts have no obligation to give deference to the defendant's interpretation. *Id.* at 1064 ("Where the statute is clear, the agency has nothing to interpret and the court has no agency interpretation to which it may be required to defer."). As the plain language of the statute here is clear, the defendant's arguments and evidence to the contrary may be disregarded.

The fact that the Corps may have, as a matter of practice, sought construction costs from local interests in the absence of pre-construction cost-sharing agreements in the nearly sixty years since the WSA was enacted does not change the language of that statute or mandate another result. Moreover, having given due consideration to Congress's intent in enacting that statute, it is not the court's province either to rewrite the statute so that it is plainly consistent with the interpretation historically given to it by the Corps, or to change the Corps' practice so that it is consistent with the statute. That is a job for Congress or the Corps.

III.    **Motion to Exclude Evidence**

The plaintiff has moved to exclude certain evidence relied on by the defendant in its response to the plaintiff's Motion for Partial Summary Judgment on the grounds that the defendant did not disclose this evidence to the plaintiff prior to filing its response. As consideration of the plaintiff's motion for partial summary judgment was limited to the plain text of the WSA and did not depend on any such extrinsic evidence, the plaintiff's motion will be denied as moot.

## <u>CONCLUSION</u>

The plaintiff has alleged facts that show that the defendant has waived sovereign immunity, that its claims are ripe for judicial review, that it has standing to pursue its claims, and that it is not required to exhaust any administrative remedies. The plaintiff also has alleged the elements of a cause of action under the Administrative Procedure Act. As this court has subject matter jurisdiction over this action and as the plaintiff has stated a claim for relief, the defendant's Motion to Dismiss will be denied.

Additionally, as the defendant has failed to raise a genuine issue of material fact as to whether it acted within the scope of its authority under the WSA, the plaintiff's Motion for Partial Summary Judgment will be granted.

Finally, the plaintiff's Motion to Exclude Evidence will be denied as moot.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge